[Cite as *Welser v. Ohio Dept. of Rehab. & Corr.*, 2016-Ohio-7352.]

| | |
|---|---|
| ERIC S. WELSER | Case No. 2015-00329 |
| Plaintiff | Magistrate Robert Van Schoyck |
| v. | <u>DECISION OF THE MAGISTRATE</u> |
| OHIO DEPARTMENT OF REHABILITATION AND CORRECTION | |
| Defendant | |

{¶1} Plaintiff, an inmate in the custody and control of defendant at the Pickaway Correctional Institution (PCI), brought this action for negligence. The action arises from a May 21, 2013 accident in which plaintiff's left index finger was severed by a machine in the Ohio Penal Industries (OPI) print shop at PCI. The issues of liability and damages were bifurcated and the case proceeded to trial on the issue of liability.

{¶2} Plaintiff testified at trial that he came to PCI in 2009, and prior to his imprisonment he worked in various maintenance, construction, and mechanical jobs. Plaintiff stated that in 2012 he obtained a job in the OPI print shop where he operated a Heidelberg stamping press and a Rosback perforator.

{¶3} According to plaintiff, he constantly had problems with the perforator, such as perforations being cut too deep or not deep enough, misalignment of the perforations, breakage of perforator teeth, and the automatic paper feeder not working such that paper had to be manually fed into the machine. Plaintiff testified that he repeatedly notified William Dixon, the manager of the shop, as well as other staff about the various problems that he had with the perforator but the issues persisted. Plaintiff also testified, though, that he was never before injured by the perforator, nor was he aware of anyone else being injured by it, and most of the issues that he described had no connection to the accident.

{¶4} Plaintiff testified that on the day of the accident, he had problems getting paper to feed properly into the perforator. Plaintiff stated that he approached Mark Mendenhall, an employee of defendant's in the shop, and told him he was having problems, but Mendenhall told him to just do whatever it took to get the job done. According to plaintiff, the inmate maintenance workers who maintained the various machines in the shop were busy at that time and he did not feel that he had time to wait, so he decided to fix the perforator himself. Plaintiff recounted that he told Mendenhall he needed to go get tools, and then he went to a cart belonging to the inmate maintenance workers and took a pair of pliers, a hammer, a screwdriver, and a set of Allen wrenches.

{¶5} Plaintiff stated that he had not received any training on how to perform repairs or maintenance of the perforator, only that when he first started using the perforator he was issued an operator's manual that included some information about troubleshooting. Plaintiff acknowledged that machine maintenance was not among his job duties, and that those responsibilities belonged to the inmate maintenance workers in the shop. In addition to inmate maintenance workers, plaintiff testified that he had also seen an employee of defendant's in the shop, William Greer, work on the machine.

{¶6} Plaintiff stated that there had been a clunking sound coming from inside the perforator when he started having problems that morning, so he unbolted and removed the panel covering the gear box because he wanted to observe the gears in operation and see if he could determine where the sound was coming from. A photograph of the cover that plaintiff removed was admitted into evidence. (Plaintiff's Exhibit 3.) Plaintiff related that he could not figure out what the problem was, so he turned on the machine to watch the gears in motion. From plaintiff's version of events, defendant's employees in the shop that morning saw or were at least in a position where they could have seen what he was doing.

{¶7} Plaintiff admitted that he was aware of the danger associated with the exposed moving parts. Plaintiff also testified that the cover he removed from the perforator constituted a safety device, and he acknowledged that there is a sign hanging in the shop warning inmates not to operate equipment unless all safety devices are in place, a photograph of which was admitted into evidence. (Defendant's Exhibit A.)

{¶8} As plaintiff described, he spent about 15 minutes watching the machine and trying to work on it, and during that time inmate Patrick Yelvington, whom plaintiff described as his supervisor, came by multiple times and pestered him about getting his work done. According to plaintiff, Yelvington was in good favor with the shop management and exercised authority over the other inmates. Plaintiff testified that Yelvington was distracting him and he finally told Yelvington "leave me the fuck alone," but even after that Yelvington returned once more. At that point, plaintiff stated, he leaned forward and reached to turn the perforator off with his right hand, but when he did so his left hand inadvertently swung forward and got caught in the gears, severing his left index finger. Plaintiff stated inmate Thomas Salvito retrieved the finger for him before he left to get medical attention, but the finger was not reattached. Medical records show that the time of plaintiff's visit to the prison infirmary was about 7:55 a.m. (Plaintiff's Exhibit 4.)

{¶9} Inmate Thomas Salvito testified that he has been incarcerated at PCI for 12 years, and at the time of the accident he operated a press and other machines in the print shop. Salvito related that when he started working there a few years earlier, he used to operate the perforator. Salvito also related that he worked in the print shop at the former Orient Correctional Institution in the 1980s.

{¶10} According to Salvito, many of the machines in the print shop at PCI had mechanical problems that required frequent repairs and maintenance, and in general the inmate maintenance workers were not particularly skilled. Salvito stated that he was not trained in maintenance and Dixon had told the inmates working in the print shop to

leave the maintenance to the inmate maintenance workers, but it was not uncommon for the inmates operating the machines to perform that kind of work themselves. From Salvito's recollection, he had some problems with the perforator when he used to operate it, such as having to hand-feed paper into it, but he was not aware of inmates ever being hurt on it. As Salvito described, when you operate the machines you come to learn the characteristics of each one and how to make adjustments and keep them running.

{¶11} Salvito recalled that he was operating a press and had his back to plaintiff when the accident occurred, but he heard a crunch and when he went over to see what happened, plaintiff told him to get his finger. Salvito stated that he did so and gave plaintiff a rag in which to wrap the finger.

{¶12} Inmate William Elson testified that he has been incarcerated at PCI for eight years and started working in the print shop in 2011. Elson explained that at the time of the accident he worked a quality assurance job, which involved checking the quality of the products coming out of the shop, but he did not operate any of the machinery. Elson stated that he was aware of some mechanical problems with the perforator and that he would see the inmates who operated the various machines make some minor adjustments here and there, but he testified that it was a matter of policy that the machine operators were not supposed to undertake maintenance or repair work, as that was for the inmate maintenance workers. Elson further testified that the inmates who operated the machines were not supposed to take tools from the inmate maintenance workers' carts either, at least not without staff approval.

{¶13} Elson stated that he did not witness the accident. Regarding the pressure to fulfill work orders, Elson stated that every work order had a due date and the inmates working in the print shop always tried to get each job done quickly.

{¶14} Inmate Wayne Timmons testified that he has been incarcerated at PCI for about six years and started working in the print shop in early 2011. Timmons stated

that at the time of the accident he worked in a quality assurance position, but that there had been a two or three-month period before plaintiff started working there when he used to operate the perforator. From what Timmons could recall, he had some problems with the perforator, such as having to hand feed paper into it, blades getting dull and needing to be changed, and papers not running in a straight line through the machine, but he never had a problem with the gears and he never removed the cover that plaintiff took off of the machine. Timmons testified that although he was only sitting about 25 or 30 feet away from the perforator when the accident happened, he had not noticed beforehand that plaintiff removed the cover.

{¶15} Inmate John Earwood testified that he has been incarcerated at PCI for 14 years, and at the time of the accident he worked in the print shop as a line leader. Earwood testified that he used to work in the print shop at the former Orient Correctional Institution, where at one time there were three perforators including the one at issue in this case. Earwood stated that he operated the perforators, among other machinery, at Orient from about 2002 to 2005, and he estimated that they dated to about the 1970s. Earwood related that he was aware of some mechanical problems with this particular perforator, including the need to manually feed paper into it and excessive blade vibration. According to Earwood, he was in the print shop when the accident occurred but did not witness it.

{¶16} Inmate Patrick Yelvington testified by way of deposition.[1] (Plaintiff's Exhibit 10.) Yelvington testified that at the time of the accident, he worked in the print shop as an inmate supervisor. Yelvington stated that 20 or more years ago he used to work in a print shop at the Southern Ohio Correctional Facility, and he stated that the perforator at issue was located there at that time, and he remembers when it was shipped off to the former Orient Correctional Institution. According to Yelvington, he had complained to

---

[1]The objections raised in the deposition transcript at page 11/line 9, page 12/line 24, page 14/line 14, page 14/line 23, page 17/line 21, and page 20/line 8 are OVERRULED; the objections raised at page 8/line 6, and page 10/line 2 are SUSTAINED.

Dixon and other staff members about various problems with the perforator but nothing happened and the inmate maintenance workers and operators just kept it running the best they could. Yelvington stated, though, that he was not aware of anyone being injured by the perforator before plaintiff.

{¶17} On the day of the accident, according to Yelvington, the paper feeder was not working properly and there was a problem with the perforating blade not lowering to the correct depth. From what Yelvington recalled, plaintiff was trying to fix the problem with the blade. Yelvington testified that plaintiff had informed him that he was going to remove the cover and look inside, and that he told plaintiff to go ahead. Yelvington stated that removing the cover required obtaining Allen wrenches from an inmate maintenance worker's cart in order to unscrew the bolts that held the cover in place. According to Yelvington, the inmates operating the machines were allowed to take tools from the cart without staff approval, and Yelvington stated that all the machine operators performed some maintenance on their machines from time to time.

{¶18} Yelvington recalled that there was some pressure that particular day to get things done, as the shop was behind on some work orders, apparently for perforated inmate passes. Yelvington stated that he urged plaintiff to hurry up and get his work done. Yelvington recalled seeing plaintiff, with the machine running and the cover over the gear box removed, reach to turn the machine off, and then he heard plaintiff scream.

{¶19} William Dixon testified that he is employed with defendant at PCI as the Industrial Manager of the OPI shop, a role in which he attends to all the administrative responsibilities for the shop and oversees the inmates working there. Dixon stated that he tries to be on the production floor as much as he can, but it depends on the amount of administrative work that he has, and a lot of his time is spent at his desk or in meetings. Dixon testified that other staff members who worked in the shop during that time period included William Greer and Mark Mendenhall, who served as floor supervisors and were on duty that morning, and Florence Cruse, who was the

superintendent of the print shop and basically served as a middle manager between him and the floor supervisors, but Dixon was not sure whether Cruse was on duty that morning.

{¶20} Dixon testified that inmates assigned to operate machines in the shop are not permitted to perform maintenance on the machines, and he described maintenance as anything other than the standard setup or adjustments associated with each machine, such as paper alignment in the case of the perforator. As Dixon related, the only inmates who were allowed to access the tools that were necessary to remove the cover from the gear box of the perforator were inmate maintenance workers. Dixon stated that any other inmate would at least need staff approval to use those tools for any reason. Dixon also stated that any work performed on a machine by inmates is supposed to be logged in a Mechanical Equipment Inspection Record for that particular machine, and the record for the perforator was admitted into evidence. (Plaintiff's Exhibit 9.) Dixon testified that an inmate assigned to operate machinery would not be permitted to remove the cover to a gear box on his own, and there are signs hanging around the shop instructing inmates not to work on equipment if they are not trained to do so, such as the one photographed and admitted into evidence as Defendant's Exhibit A. Dixon recalled seeing inmate maintenance workers, including an inmate Simpson, remove the cover from the gear box, but he had not seen plaintiff or any other inmate machinery operator working on the perforator without a maintenance worker helping them.

{¶21} According to Dixon, the perforator was older and had come from the former Orient Correctional Institution, and he did hear some complaints from inmates who felt that it was not running the way they thought it should, but the perforator still functioned effectively and produced a quality product. Dixon stated that Yelvington had come to him once or twice with concerns about the perforator, but what he talked about was the perforating wheel needing to be sharpened, or setup issues that did not affect

operability. Dixon recalled ordering rubber drive wheels for the machine one time, apparently to address a problem with the mechanism to feed paper into the machine. Dixon also stated that safety concerns were never raised to him, and when he does get concerns like that, if they are valid, he puts a machine out of service. Dixon stated that he is not aware of any other inmate ever being injured by the perforator.

{¶22} Dixon testified that he was in his office when the accident occurred. Dixon stated that he did not see what plaintiff was doing nor did he know plaintiff had removed the cover from the gear box, and no one had said anything to him about the perforator that morning. From Dixon's description, his office is roughly 60 feet from the perforator and there are windows such that it is possible for him to see that area, but he does not always have an unimpeded view of the perforator. As Dixon described, there were about 63 inmates working at that time, and there were about 35 different machines on the floor. Dixon acknowledged that an inmate leaning over and looking into a machine, rather than performing his job, might get his attention, at least eventually, but he was certain that he was not aware of what plaintiff was doing.

{¶23} Regarding plaintiff's testimony that Yelvington pressured him, Dixon testified that Yelvington worked as a line leader, which meant that he was responsible for ensuring that work orders are completed, but line leaders are not supervisors and they are not to have an edge over any other inmate. Dixon stated that Yelvington did not have authority to order any other inmate to get his work done.

{¶24} Mark Mendenhall testified that he is employed with defendant at PCI as a Penal Workshop Specialist in the OPI print shop, and he described his job as essentially being a floor supervisor, overseeing production, shipping, and control of tools and chemicals.

{¶25} Mendenhall testified that inmates had mentioned certain problems to him over time regarding the perforator, mainly being that the blades were not sharp enough and that paper did not feed properly into the machine. Mendenhall recalled hearing

about those particular issues from Yelvington and plaintiff. By Mendenhall's estimate, the perforator was probably a 1970s model. Mendenhall stated, though, that the perforator still worked well enough to produce a good product, and that none of the complaints he received represented a safety concern. Mendenhall recalled looking up information about getting replacement blades at one point and passing the information along to Dixon, but he does not know whether they were ordered, and he did not have authority himself to order replacement parts. Mendenhall, like Dixon, testified about and authenticated a copy of the Mechanical Equipment Inspection Record for the perforator, in which inmate maintenance workers logged the work that they performed. (Plaintiff's Exhibit 9.)

{¶26} Mendenhall testified that every day he would issue tools at the beginning of the workday and again around noon, and inmates were not supposed to possess a tool without staff authorization. Mendenhall testified that tools were issued to the inmate maintenance workers, as well as inmates who operated certain machines which required tools, such as press operators, but none of the inmates operating machines should have had the kind of tools that plaintiff used that morning. According to Mendenhall, for plaintiff to have those kinds of tools, plaintiff either had authorization or he impermissibly took the tools. Mendenhall stated that he has no recollection of plaintiff talking to him that morning, to ask for tools or otherwise. Mendenhall also stated that he knows he spoke with inmate maintenance workers that morning, and he had no indication from speaking with them that plaintiff took their tools. From Mendenhall's recollection, there were three or four inmate maintenance workers in the shop around that time.

{¶27} According to Mendenhall, he had no knowledge that plaintiff took the cover off the gear box of the perforator, and he never would have authorized a machine operator to do something like that on his own. Mendenhall stated that he did not see plaintiff remove the cover, nor did anyone say anything to him about it. Mendenhall

recalled that he started his day in the chemical room and the tool room, and after that he went to his cubicle and got on the computer to attend to some shipping matters. Mendenhall stated that his cubicle was about 65 feet from the perforator. According to Mendenhall, he then went into Dixon's office about 15 minutes before the accident to speak with Dixon about shipping issues, but he had to wait because Dixon was on the telephone. Mendenhall related that he was never closer than about 60 feet from the perforator that morning. Mendenhall's recollection was that Greer had gone outside to get the van that the shop used to ship products, and he did not know where Cruse was.

{¶28} Mendenhall recalled plaintiff coming up to him in Dixon's office and saying that he lost his finger. Mendenhall testified that he told Dixon and then went and retrieved the finger with Salvito, and after the finger was wrapped up plaintiff went to the infirmary.

{¶29} "In a claim predicated on negligence, plaintiff bears the burden of proving by a preponderance of the evidence that defendant breached a duty owed to him and that this breach proximately caused the injury." *Woods v. Ohio Dept. of Rehab. & Corr.*, 130 Ohio App.3d 742, 744 (10th Dist.1998).

{¶30} "In the context of a custodial relationship between the state and its prisoners, the state owes a common-law duty of reasonable care and protection from unreasonable risks." *Jenkins v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 12AP-787, 2013-Ohio-5106, ¶ 8. "The state's duty of reasonable care does not render it an insurer of inmate safety." *Allen v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 14AP-619, 2015-Ohio-383, ¶ 17. "Reasonable care is that degree of caution and foresight an ordinarily prudent person would employ in similar circumstances, and includes the duty to exercise reasonable care to prevent an inmate from being injured by a dangerous condition about which the state knows or should know." *McElfresh v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 04AP-177, 2004-Ohio-5545, ¶ 16. "Where an inmate also performs labor for the state, the state's duty must be defined in

the context of those additional factors which characterize the particular work performed." *Barnett v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 09AP-1186, 2010-Ohio-4737, ¶ 18. "The inmate also bears a responsibility 'to use reasonable care to ensure his own safety.'" *Gumins v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 10AP-941, 2011-Ohio-3314, ¶ 20, quoting *Macklin v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 01AP-293, 2002-Ohio-5069, ¶ 21.

{¶31} Upon review of the evidence presented at trial, the magistrate finds the following. On May 21, 2013, plaintiff reported for work in the print shop, where he had been operating the perforator for several months. The perforator had been in use for many years and had some flaws that could affect the quality of the product and caused some inconvenience to the operators, such as having to hand feed the paper into the machine, but it was periodically serviced by inmate maintenance workers, it was safe to operate, and no one had been injured on it before.

{¶32} On that day, plaintiff worked on perforating a batch of inmate passes. Early on in his shift, plaintiff felt that there was a mechanical problem with the perforator. Plaintiff took it upon himself to go to one of the inmate maintenance workers' carts and take several tools, without staff approval, and he returned to the perforator. Plaintiff used a wrench to remove bolts that held in place a safety cover over the gear box of the perforator. Considering the varying and somewhat confusing testimony on the subject from plaintiff and Yelvington, the nature of the perceived problem and what exactly plaintiff was trying to do were not established, and his removing the cover was not shown to be necessary.

{¶33} Plaintiff, not being able to diagnose any problem, then turned on the perforator to watch the system of cogs, gears, and chains in operation. The inmates in the shop were running behind on fulfilling some work orders, and while plaintiff had the cover off of the gear box, Yelvington came up and urged him to finish up whatever he was doing and get back to perforating the passes so they would not fall any further

behind.  Plaintiff reached with his right hand to turn the perforator off, but he failed to pay attention to where his left hand was at, and he inadvertently stuck his left index finger in the gears, severing the finger.

{¶34} Plaintiff failed to establish all the elements necessary to sustain a claim of negligence.  For one, the greater weight of the evidence demonstrates that defendant did not breach its duty of care.  The perforator was safe to operate, and, but for plaintiff's actions, the gear box was shielded by a safety cover that was bolted down to the frame of the machine.  It was not established that any problem developed that morning which prevented plaintiff from safely using the perforator, but even if it had, plaintiff should have notified a staff member, but he did not do so.  Defendant had inmate maintenance workers on duty in the shop such that plaintiff did not need to attempt a repair by himself.  In fact, defendant had rules in place and signs affixed to the walls in the shop to prohibit a machine operator such as plaintiff from removing safety covers and doing the kind of work that plaintiff was attempting to do.

{¶35} Plaintiff also sought to show that Dixon, Mendenhall, or other staff members knew or should have known what he was doing, foreseen that he might be injured, and taken some action to protect him.  But the shop was a beehive of activity, teeming with dozens of inmates performing various tasks all over the large production floor, and plaintiff testified that he was able to work independently, with minimal supervision.  The only staff members shown to have been in the shop at that time, Dixon and Mendenhall, credibly described their whereabouts and established that they did not see what plaintiff was doing.  Even inmate Timmons, who was much closer to the perforator than Dixon or Mendenhall, was not aware of what plaintiff was doing.  Plaintiff had the cover off the gear box for no more than about 15 minutes before he was injured, and it was not shown that any employee of defendant knew or should have known of his actions.

{¶36} In a related argument, plaintiff asserted that the staff knew or should have known that inmates operating the perforator were in the practice of removing the cover from the gear box.  Plaintiff had never removed the cover on his own before, however, and the evidence of other inmates doing so is sporadic and spread over many years, and it was not always clear whether the testimony was about inmates who operated the perforator or inmate maintenance workers, who were allowed to do that kind of work. Indeed, Dixon and Mendenhall testified that they had never seen an inmate who operated the perforator remove the cover before.  It was simply not shown that removal of the cover by inmates operating the perforator was anywhere near being so common as to find that staff members should have known about it and had a duty to act.

{¶37} Plaintiff's negligence claim also fails on the element of causation.  While the magistrate is not without sympathy for plaintiff's injury, the evidence shows that the proximate cause of the injury was plaintiff's own negligence.  By removing the cover from the gear box, proceeding to turn the perforator on while the gear assembly was exposed, and inadvertently inserting his finger into the gear assembly, plaintiff did not exercise reasonable care for his own safety.  As previously stated, the evidence does not establish that it was necessary for plaintiff to remove the cover and expose himself to the moving parts.  Plaintiff asserts that Yelvington was partly to blame for what happened and that defendant should be liable for Yelvington's actions, but Yelvington did not order plaintiff to remove the cover and expose himself to the moving parts. Yelvington did not have authority to order plaintiff around, and even if he had attempted to exercise such authority, there is no credible evidence that defendant had notice of the same.  Whether or not plaintiff was frustrated with Yelvington, plaintiff was carrying out a dangerous act that he should not have been performing in the first place, and it was his decision to do that, coupled with his failure to keep his hand away from the moving parts, that proximately caused his injury.  Even if plaintiff had been able to establish

some negligence that could be attributed to defendant, it would be outweighed by his own negligence.

{¶38} Based on the foregoing, the magistrate finds that plaintiff failed to prove his claims by a preponderance of the evidence. Accordingly, judgment is recommended in favor of defendant.

{¶39} *A party may file written objections to the magistrate's decision within 14 days of the filing of the decision, whether or not the court has adopted the decision during that 14-day period as permitted by Civ.R. 53(D)(4)(e)(i). If any party timely files objections, any other party may also file objections not later than ten days after the first objections are filed. A party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion within 14 days of the filing of the decision, as required by Civ.R. 53(D)(3)(b).*

_____
ROBERT VAN SCHOYCK
Magistrate

cc:

Richard F. Swope
6480 East Main Street, Suite 102
Reynoldsburg, Ohio 43068

Jeanna V. Jacobus
Assistant Attorney General
150 East Gay Street, 18th Floor
Columbus, Ohio 43215-3130

**Filed September 23, 2016**
**Sent to S.C. Reporter 10/17/16**